*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 22, 2024

       Plaintiff-Appellee,

v

No. 362231
Ingham Circuit Court
LC No. 21-000085-FH

PHOENIX JOVAN WASHINGTON,

       Defendant-Appellant.

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

No. 362233
Ingham Circuit Court
LC No. 21-000083-FH

PHOENIX JOVAN WASHINGTON,

       Defendant-Appellant.

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

No. 362234
Ingham Circuit Court
LC No. 21-000084-FH

PHOENIX JOVAN WASHINGTON,

       Defendant-Appellant.

---

Before: MALDONADO, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Defendant, Phoenix Jovan Washington, appeals as of right three judgments of sentence entered following a single jury trial. In Docket No. 362231, Washington appeals his convictions of domestic violence, MCL 750.81(2); and interfering with an electronic communication, MCL 750.540(5)(a). In Docket No. 362233, he appeals his convictions of assault by strangulation or suffocation, MCL 750.84(1)(b); unlawful driving away of an automobile (UDAA), MCL 750.413; malicious destruction of property, MCL 750.377a(1)(c)(*i*); and domestic violence. In Docket No. 362234, he appeals his convictions of first-degree home invasion, MCL 750.110a(2), and UDAA. The trial court sentenced Washington to 67 to 120 months' imprisonment for the assault by strangulation or suffocation conviction, 29 to 60 months' imprisonment for the first UDAA conviction, 24 to 60 months for the second UDAA conviction, 100 to 240 months' imprisonment for first-degree home invasion conviction, and 365 days in jail for his domestic violence convictions, his malicious destruction of property conviction, and his interfering with an electronic communication conviction. For the reasons stated in this opinion, we vacate the conviction of first-degree home invasion but affirm the remaining convictions and sentences.

## I. BASIC FACTS

Washington's convictions arose from three separate incidents involving ZM, his former romantic partner and the mother of his child. The prosecutor presented evidence that Washington struck ZM and took her telephone on January 5, 2020; strangled her, hit and kicked her, smashed her telephone, and took her car[1] on October 4, 2020; and broke into her apartment and again took her car on October 19, 2020. Although ZM did not appear for trial, the convictions were supported, in part, by numerous out-of-court statements and 911 calls.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Washington first contends that the conviction of first-degree home invasion was not supported by sufficient evidence. "This Court reviews de novo claims of insufficient evidence, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Bennett*, 290 Mich App 465, 471-472; 802 NW2d 627 (2010). Questions of statutory interpretation are also reviewed de novo. *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 2.

> In doing so, our purpose is to discern and give effect to the Legislature's intent. We begin by examining the plain language of the statute; where that language is unambiguous, we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written. We must give the words of a statute their plain and ordinary meaning, and only where the statutory language is ambiguous may we

---

[1] The car belonged to ZM's mother but ZM had been granted permission to use it.

look outside the statute to ascertain the Legislature's intent. [*Id*. (quotation marks and citations omitted).]

## B. ANALYSIS

The first-degree home invasion statute provides:

A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:

(a) The person is armed with a dangerous weapon.

(b) Another person is lawfully present in the dwelling. [MCL 750.110a(2).]

Here, it is undisputed that Washington broke into ZM's apartment while she and her child were present. But Washington contends that he could not have been guilty of first-degree home invasion because the UDAA felony did not occur at any location in the dwelling.

On appeal, the prosecution focuses on the phrase "[a] person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling." It argues that, under the rule of the last antecedent, the defendant only needed to have had an intent to commit a felony *somewhere* when entering the dwelling, not an intent to commit a felony *in the dwelling*. In support, the prosecutor cites *People v Henderson*, 282 Mich App 307; 765 NW2d 619 (2009). In *Henderson*, this Court stated that "[g]enerally a modifying clause will be construed to modify only the last antecedent, *unless something in the subject matter or dominant purpose requires a different interpretation*." *Id*. at 328 (emphasis added). Here, given the statute's overall emphasis on dwellings, it does not make logical sense that a person would be guilty of first-degree home invasion if he or she was intending to commit a felony or larceny elsewhere. It does not make any logical sense that the Legislature would have required that an intended "assault" be in the dwelling but that an intended "larceny" or "felony" could occur anywhere inside or outside of the dwelling. Accordingly, we reject the prosecution's limited interpretations of the statute.

Here, in accordance with the statute's plain language, the jury was instructed that it had to find "that when [Washington] entered, was present in, or was leaving the dwelling, he committed the offense of unlawfully driving away an automobile." MCL 750.110a(1)(a) defines "[d]welling" as "a structure or shelter that is used permanently or temporarily as a place of abode, including an appurtenant structure attached to that structure or shelter." The definition mentions appurtenant structures but does not mention curtilages. Washington took the car in question from the parking lot or the street of the apartment complex, not from an attached garage. Accordingly, he was not in the dwelling when he committed the UDAA.

Nor was he "exiting" the dwelling when he committed the UDAA. "The essential elements of UDAA are (1) possession of a vehicle, (2) driving the vehicle away, (3) that the act is done wilfully, and (4) the possession and driving away must be done without authority or permission." *People v Hendricks*, 200 Mich App 68, 71; 503 NW2d 689 (1993), aff'd 446 Mich 435 (1994).[2] *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the transitive-verb version of "exit" as "leave." Washington was not exiting or leaving the "structure or shelter," MCL 750.110a(1)(a), when he took possession of the car; he had already left the structure and had walked to the parking lot or street. Just as a person is not "entering" a dwelling when still in the street or parking lot, a person is not "exiting" a dwelling when already in the parking lot or street.

In sum, because there is no evidence that Washington committed the offense of UDAA while entering, present in, or exiting the dwelling, we conclude that the conviction of first-degree home invasion must be vacated on the basis of insufficient evidence.[3]

## III. EVIDENTIARY HEARING

## A. STANDARD OF REVIEW

Washington next asserts that the trial court erred by failing to hold an evidentiary hearing on his claim of ineffective assistance. "A trial court's decision to hold an evidentiary hearing is generally reviewed for an abuse of discretion." *People v Danto*, 294 Mich App 596, 613; 822 NW2d 600 (2011). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

## B. ANALYSIS

After trial, Washington's new lawyer filed a supplement to Washington's motion for a new trial. He argued that an evidentiary hearing "would be the proper course of action to determine the veracity of Mr. Washington's assertions; to confirm he would have accepted the offer if properly advised; and to hear from trial counsel." In an affidavit accompanying the motion, Washington averred that his trial lawyer told him "[a]s long as [ZM] does not show we have an [sic] 95% chance on winning the case." At the motion hearing, Washington's new lawyer stated, "I think that it would be proper to have an evidentiary hearing to actually hear from trial counsel

---

[2] We note that Washington may have taken the keys to the vehicle while he was in the apartment. However, in order to be guilty of first-degree home invasion, the prosecution must prove that the defendant committed a felony while "entering, present in, or exiting the dwelling." MCL 750.110a(2). Merely taking keys while in or exiting the dwelling is insufficient to prove that a defendant is guilty of UDAA.

[3] Because we are vacating Washington's first-degree home invasion conviction for insufficiency of the evidence, we do not address Washington's argument that his sentence for that offense was not proportional. Rather, we remand for further proceedings to allow the court to determine what effect, if any, our decision to vacate this conviction has on the sentences Washington received for the remaining convictions.

to see if he, in fact, gave that type of advice, and test my client's credibility as well." The prosecution responded that an evidentiary hearing was unwarranted because Washington had not averred that he would have plead if his lawyer had not advised him differently.

To prove ineffective assistance in connection with allegedly defective advice leading to rejection of a plea offer, a defendant must show that, but for his lawyer's ineffective advice "there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of the intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Thurmond*, ___ Mich App at ___; slip op at 14 (quotation marks and citation omitted). A trial court does not abuse its discretion by refusing to hold an evidentiary hearing when the defendant fails to allege that he or she would have accepted the plea if he or she had received "correct" information from his or her lawyer. *Hill v Lockhart*, 474 US 52, 60; 106 S Ct 366; 88 L Ed 203 (1985). That is, under such circumstances, the defendant's failure to even allege prejudice warrants the trial court declining to hold an evidentiary hearing. *Id*.

Here, even assuming that Washington's trial lawyer informed him that he would have a 95% chance of acquittal if ZM did not appear for trial and even assuming that this "prediction" was evidence of deficient performance, Washington did not allege in his affidavit that he would have pleaded guilty if his lawyer had provided more "viable" odds. Moreover, as noted, at the motion hearing, Washington's new lawyer argued that an evidentiary hearing "would be the proper course of action to determine the veracity of Mr. Washington's assertions; to confirm he would have accepted the offer if properly advised; and to hear from trial counsel." This was, in effect, a concession that Washington had not yet averred that he would have accepted the offer if given "accurate" advice. In light of the reasoning in *Hill*, we cannot conclude that the trial court abused its discretion by declining to hold an evidentiary hearing.

## IV. JOINDER

### A. STANDARD OF REVIEW

Washington next contends that the trial court improperly joined the three cases. "Whether joinder is appropriate is a mixed question of fact and law." *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014). "To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute "related" offenses for which joinder is appropriate." *Id*. (quotation marks and citation omitted). The court's factual findings are reviewed for clear error, but its determinations of law are reviewed de novo. *Id*. "However, the ultimate decision on permissive joinder of related charges lies firmly within the discretion of trial courts." *Id*. (quotation marks and citation omitted).

### B. ANALYSIS

MCR 6.120 states:

**(B) Postcharging Permissive Joinder or Severance.** On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\* \* \*

**(C) Right of Severance; Unrelated Offenses.** On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).

The prosecution filed a motion to join the three cases and also to admit, under MCL 768.27b (stating that, generally, if a defendant is accused of a domestic-violence offense, evidence that the defendant committed other acts of domestic violence are admissible for any purpose), evidence pertaining to each case for use in the other cases. The trial court ruled:

[I]n regard to joinder, I am granting that. It looks like these are all related. There are very clear jury instructions. If you don't think they're clear enough, we certainly can do some additional or compromised language, but there is a very clear jury instruction that I often give, as you both know. You've both been in front of me multiple times and multiple other judges, so that jury instruction does talk about there being multiple charges and how a jury is supposed to deal with each one separately.

Additionally, you are both very capable of voir dire, and we do know there are certain jurors who say, yeah, there's more than a couple of charges. They must have done it no matter what, and they never heard any piece of evidence, so we toss that juror, you know, back into the pool and we say, thank you, but you're excused. And I'm happy to do that. So rigorous voir dire hopefully will address that issue.

-6-

That being said, I think joinder is appropriate in this case. These are three files that look to me to all be related, and at trial the jury will not know there's three files. It will be Count 1, 2, 3, 4, 5, however many there are, because they're not going to know there's more than one file. That, I think, is prejudicial, so we're just going to put all of these as a continuation.

As to the other acts, I'm going to allow the other acts. It does say commission of other acts of domestic violence or sexual assault admissibility disclosure under [MCL] 768.27b [sic]. I do agree it did come out of a lot of cases of sexual assault, but it also came out of a lot of cases of domestic violence that were alleged where people were afraid, didn't show up, and there's a whole history there that we all know I don't need to make a record of.

And it's been made very clear that it trumps [MRE] 404b. So with this statute, I am going to allow it to come in; but . . . I am going to be very mindful . . . that it must be used appropriately for the domestic violence. . . .

Pertinent questions when assessing whether joinder is appropriate are whether the joined offenses are logically related and whether there are overlapping areas of proof. See *People v Williams*, 483 Mich 226, 237; 769 NW2d 605 (2009). Here, the offenses were logically related because they all involved Washington's single scheme or plan to terrorize ZM. In *People v Miller*, 165 Mich App 32, 36; 418 NW2d 668 (1987),[4] remanded on other grounds 434 Mich 915 (1990), and abrogated on other grounds by *People v Kennedy*, 502 Mich 206; 917 NW2d 355 (2018), sexual assaults against the victim spanned five months. Regarding joinder, this Court stated:

the charges against defendant are not based on the "same conduct" since the evidence does not indicate a single transaction. Nor are they based on "a series of facts connected together" due to the time frame contained in the information. These offenses are more akin to a "series of acts . . . constituting parts of a single scheme or plan." Here, the victim's testimony revealed that these incidents occurred during warm weather and at the learning center in locations of seclusion. These facts indicate a single plan or scheme on the part of defendant to sexually molest the victim when the opportunity presented itself.

Moreover, the trial did not involve substantially different proofs on these charges to the extent that it would confuse the defendant in his defense, or deprive him of any substantial right. [*Miller*, 165 Mich App at 45.]

Similarly, even though there was a temporal gap in the present case, the evidence overall revealed Washington's plan to terrorize ZM and take her telephone and car from her.

---

[4] Although this Court is not strictly required by MCR 7.215(J)(1) to "follow uncontradicted opinions from this Court decided before November 1, 1990, . . . they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases . . . ." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

In addition, whether the evidence pertaining to one case would have been admitted in the other cases is a valid consideration when assessing a joinder decision, because if it would have, no prejudice arises from the joinder. See *Williams*, 483 Mich at 237. On appeal, Washington does not make any developed appellate argument that the court's decision that the evidence in each case would be admitted in the other cases was erroneous. As a result, the (unchallenged) admissibility of the evidence from each case in the other cases supports the joinder decision.

Reversal is not warranted under the circumstances present in this case.

## V. MISSING WITNESS INSTRUCTION

Washington next contends that the trial court erred by failing to give a missing-witness jury instruction in light of ZM's failure to appear at trial. We conclude that Washington has waived review of this issue.

At the close of the prosecution's case, the prosecutor mentioned that Washington's lawyer had implied in his opening statement that if ZM did not appear for trial, this should be held against the prosecution. The prosecutor said that holding ZM's absence against the prosecution was not allowable because due diligence had been exercised in trying to get her to appear. However, the defense lawyer argued that her absence could be held against the prosecution because ZM had been an endorsed witness. The court and parties took a recess to research the issue.

Upon returning to the courtroom and before the jury returned, the court discussed caselaw and then said, "Finally, what we did in chambers after talking about all of this is came up with—and I'm not sure where it's placed now in these 40-some pages, but with a special jury instruction." The court said that the proposed instruction was " 'You have heard that [ZM] is absent from this trial. You may make any reasonable inference you wish about her absence.' " The court asked the parties if it had missed or misstated anything. Washington's lawyer raised no concern about the proposed special instruction. In fact, he stated that "we have had very fruitful discussions this afternoon both in chambers and on the record working collaboratively towards getting an appropriate set of instructions, and I am satisfied with the instructions with which we have come up." Subsequently, the court gave the proposed instruction to the jury when providing its final jury instructions. The court then asked, "Counsel, are you satisfied with the reading of the instructions[?]" Washington's lawyer replied, "Yes, Your Honor."

As stated in *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011):

> This Court has defined waiver as the intentional relinquishment or abandonment of a known right. One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error. When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver. [Quotation marks and citations omitted.]

See also *People v Hershey*, 303 Mich App 330, 350-351; 844 NW2d 127 (2013) (discussing waiver in the context of jury instructions). The circumstances surrounding the special jury instruction applicable to ZM's absence from trial present a clear instance of waiver. Accordingly, Washington cannot now seek appellate review for his claimed deprivation of rights.

## VI. ADMISSION OF EVIDENCE

### A. STANDARD OF REVIEW

In both the brief filed by his appellate counsel and in his Standard 4 brief, filed under Supreme Court Administrative Order 2004-6, Standard 4, Washington contends that the trial court improperly allowed into evidence a 911 call associated with the October 4 incident. He contends that its admission violated his Confrontation Clause rights and also contends that MCL 768.27c did not justify admission of the call. Constitutional issues are reviewed de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). However, Washington's unpreserved argument regarding MCL 768.27c is unpreserved, so our review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), mod on other grounds by *People v King*, 512 Mich 1; 999 NW2d 670 (2023). Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (citation, quotation marks, and brackets omitted).

### B. ANALYSIS

In the audio recording of the 911 call, ZM can be heard crying and hysterically stating that Washington had beaten her, choked her, "almost killed her," taken her car, and broken her telephone. She states in the recording that she had had "to run to [her] cousin's house" next door and was there currently, using her cousin's telephone. She clearly sounds upset, states that she is "really scared," and states that Washington gave her a "bloody nose and black eye." ZM hysterically states that she "thought [she] was about to die" when Washington choked her because she could not breathe. The 911 operator tells ZM to make sure the doors and windows are locked and states that an officer would be on his or her way.

"The Confrontation Clause of the Sixth Amendment [of the United States Constitution] bars the admission of 'testimonial' statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Walker*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006). As set forth by the Court in *Walker*, *id*. at 61:

> Police interrogations [that are] . . . solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator, fall squarely within the class of testimonial hearsay subject to the Confrontation Clause. A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or

prove some past fact, but to describe current circumstances requiring police assistance. [Quotation marks, citations, and brackets omitted.]

The *Walker* Court ruled that the 911 call at issue in that case was not testimonial:

. . . [T]he 911 call, objectively considered, was a call for help, such that the statements elicited were necessary to resolve the present emergency, rather than learn what had happened in the past to establish evidence of a crime. The victim appeared at her neighbor's home, crying and shaking and seeking help in response to an alleged beating. She had reportedly escaped from defendant by jumping from a second-story balcony. The 911 call made by the neighbor was a call for help . . . .

The subsequent questioning during the 911 call was directed at eliciting further information to resolve the present emergency and to ensure that the victim, the neighbor, and others potentially at risk, including the victim's eight-year-old son, would be protected from harm while police assistance was secured. The emergency operator sought details about the assault, including the location of the neighbor's home, the circumstances of the reported beating, the perpetrator's relationship to the victim, his name, and where he was, and where the child was. The operator attempted to calm the victim and the neighbor and reassure them that the police would be responding right away. . . . [T]he circumstances of the 911 operator's questioning objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [*Id*. at 63-64 (quotation marks and citation omitted).]

We conclude that *Walker* controls this case. The 911 call was, objectively, a call for help. The statements elicited were necessary to resolve the emergency and to ensure that ZM, her child, and her cousin would be protected from harm until the police arrived. Thus, no Confrontation Clause issue is apparent with regard to the admission of the 911 call.

Washington also contends that the 911 call was inadmissible hearsay and not admissible under MCL 768.27c, which states, in part:

Evidence of a statement by a declarant is admissible if all of the following apply:

(a) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

(b) The action in which the evidence is offered under this section is an offense involving domestic violence.

(c) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of a statement made more than 5 years before the filing of the current action or proceeding is inadmissible under this section.

(d) The statement was made under circumstances that would indicate the statement's trustworthiness.

-10-

(e) The statement was made to a law enforcement officer.

Washington contends that the statute did not apply because ZM's statements were made to a 911 operator and not to a law-enforcement officer. Even assuming, without deciding, that his argument is correct, the statements made by ZM during the 911 calls were clearly admissible as excited utterances. See MRE 803(2) (indicating that a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is not excluded by the rule against hearsay). This is fully apparent from listening to the recording. Accordingly, no plain error is apparent in connection with the admission of the call.

## VII.  JUDICIAL BIAS

### A.  STANDARD OF REVIEW

Washington argues that the trial court exhibited bias by its questioning of witnesses and thereby deprived him of a fair trial. He did not object below to the questioning he now challenges. As such, we review this issue under the plain-error doctrine. *Carines*, 460 Mich at 763.

### B.  ANALYSIS

Washington takes issue with an exchange that took place after his lawyer raised a hearsay objection when the prosecutor was attempting to introduce statements made by ZM to her mother over the telephone in connection with the October 4 incident. The court interjected, questioning ZM's mother as follows:

> THE COURT.  Ma'am—
>
> THE WITNESS.  Yes.
>
> THE COURT.  —how is it you knew that your daughter was under stress of some sort?
>
> THE WITNESS.  She called my cell phone.
>
> THE COURT.  I call my mother all the time.  Give me something more than that.
>
> THE WITNESS.  She called crying from a different number.  I didn't recognize the number so I called it back, and it was her and she said she was crying—
>
> MR. HESS [defense counsel].  Objection, Your Honor.
>
> THE COURT.  Without what she said.
>
> THE WITNESS.  Okay.

-11-

THE COURT. So what else from the phone conversation? You can't see her. You're hearing her voice. You know she's calling you. What led you to believe this was something different than a normal conversation, without what she said, based on what you heard?

THE WITNESS. She was crying and screaming.

THE COURT. Okay. Would you like to ask further questions, Counsel?

Washington's lawyer then elicited that ZM's mother had had "other conversations" with ZM during which ZM got loud and upset. On appeal, Washington takes issue with this follow-up questioning by the court:

THE COURT. Was this different than those times?

THE WITNESS. Yes.

THE COURT. In what way?

THE WITNESS. I could tell she was scared.

THE COURT. Had you ever had a conversation with her where you had that sense of her being scared or frightened?

THE WITNESS. Yes.

THE COURT. And was this similar to those times or different?

THE WITNESS. It was similar.

THE COURT. I'm going to allow it.

Later during ZM's mother's testimony, the prosecutor asked how long it had taken ZM to call after the strangulation. ZM's mother said, "It just happened, like, 10, 15 minutes before." On appeal, Washington challenges this follow-up questioning by the court:

THE COURT. And how did you know that? Did she specifically say it just happened?

THE WITNESS. Well, I just got off the phone with her. We had FaceTimed. She was coming over for breakfast. So I had enough time to get to Meijer to get the food, and that's when I got the phone call.

THE COURT. Okay. So that's based on your time frame based on what you were doing in between the two phone calls?

THE WITNESS. Yes.

THE COURT. Thank you.

-12-

Washington also argues that judicial bias is apparent in the following exchange that occurred after the prosecutor attempted to introduce statements made by ZM to her mother in connection with the October 19 incident. The court questioned ZM's mother as follows:

> THE COURT. Ma'am, you received a phone call, and as a result you immediately get dressed and get in your car?
>
> THE WITNESS. Yes.
>
> THE COURT. And was that because of the urgency in her voice?
>
> THE WITNESS. I—I didn't hear from her. It was a text message at first.

Finally, he challenges the following exchange that took place when Washington's lawyer objected, on the basis of an alleged lack of medical expertise on the part of the witness, to the prosecutor's questioning of a police officer regarding whether the marks on ZM's neck on October 4 were consistent with strangulation:

> THE COURT. . . . he can testify as an officer, as a layperson, as to his— what he usually does in the course of his work, his training in that regard.
>
> So, sir, I don't want to put words in your mouth, but you said there were red marks on her neck?
>
> THE WITNESS. Yes.
>
> *  *  *
>
> THE COURT. And how would you describe what you saw on her neck?
>
> *  *  *
>
> THE COURT. And when you see these marks, what, if anything, does that tell you?
>
> THE WITNESS. It would—it would generally indicate strangulation.

The portion of the court's questioning that was omitted from Washington's brief on appeal includes that the court asked the officer whether he had "seen similar markings during the course of [his] business, [his] line of work, [his] investigations." The officer answered, "Yes," and the court asked, "About how often?" He replied, "Probably at least between 50 and 100 times in the 18 years, if not more."

As stated in *Jackson*, 292 Mich App at 597-598, "A criminal defendant is entitled to a neutral and detached magistrate. A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." (Quotation marks and citation omitted.) The *Jackson* Court went on:

Michigan case law provides that a trial judge has wide discretion and power in matters of trial conduct. This power, however, is not unlimited. If the trial court's conduct pierces the veil of judicial impartiality, a defendant's conviction must be reversed. The appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial. [*Id*. at 598 (quotation marks and citations omitted).]

Further, MRE 614 states that a court may examine a witness. In *People v Stevens*, 498 Mich 162, 173; 869 NW2d 233 (2015), the Court stated:

. . . [W]hen evaluating a judge's questioning of witnesses, a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b). *This Court has stated that the central object of judicial questioning should be to clarify.* Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information. [Citation omitted; emphasis added.]

The *Stevens* Court cautioned that a court is not to display disbelief of a witness. *Id*. at 174.

The court, in the exchanges challenged by Washington on appeal, was primarily asking clarifying questions to assist it in deciding whether to admit evidence. In the case of the question to ZM's mother regarding Washington's strangulation of ZM, the court was attempting to clarify how she knew when the strangulation occurred because this was not apparent from her prior answer. The court was asking permissible clarifying questions, and, therefore, no clear or obvious error is apparent. *Carines*, 460 Mich at 763.

Washington's conviction of first-degree home invasion is vacated but the remaining convictions are affirmed. This case is remanded for further proceedings concerning whether the vacating of the home-invasion conviction impacts the remaining sentences. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michelle M. Rick

-14-